UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Darrell Darby<br>Petitioner,<br><br>vs.<br><br>Timothy Hall<br>Respondent. | Civil Action No. 04-11271-NG |

PETITIONER'S MEMORANDUM OF LAW
IN SUPPORT OF HIS WRIT OF HABEAS CORPUS

Now comes the Petitioner, Darrell Darby, pro se, moves this Honorable Court to Grant his Writ of Habeas Corpus, based on the foregoing Memorandum of Law.

STATEMENT OF THE CASE

On February 2, 1997, indictments issued against the Petitioner, Darrell Darby, charging armed assault with intent to murder, assault and battery with a dangerous weapon, illegal possession of a firearm and illegal possession of ammunition. On October 26, 1999, a pre-trial hearing was held before McDaniels, J., presiding, seeking to suppress the identification due to the vercity and suggestiveness of the photographic array supplied to witnesses containing Petitioner's photograph. The court found the array non-suggestive and the motion was denied.

1

A jury trial began in Suffolk Superior Court on January 3, 2001, before Gershengorn, J., presiding. The jury was deadlocked and a mistrial was declared on January 9, 2001.

A second jury trial began on February 1, 2001, before Spurlock, J., presiding. On February 5, 2001, the jury returned verdicts of guilty on all charges. Petitioner was sentenced on February 8, 2001, to the Massachusetts Correctional Institution at Cedar Junction for a term of nineteen to twenty years on the armed assault with intent to murder charge; nine to ten years for the assault and battery with a dangerous weapon, to run concurrent with the armed assault sentence; four to five years on the illegal possession of a firearm charge to run concurrent with the armed assault sentence; and the illegal possession of ammunition charge was filed with a finding of guilty.

A timely notice of appeal was filed on February 8, 2001. The case was entered in the Appeals Court on June 10, 2002.

The Appeals Court denied the appeal on January 28, 2003, with the issuance of a Rule 1:28 opinion. The Supreme Judicial Court denied Further Appellate Review on April 2, 2003.

STATEMENT OF FACTS

On the morning of December 13, 1996, Roberto Rivera left school early as he had been informed that there would be trouble at the school involving him and some friends (Tr.2:15, 17)[1].

---

[1] Reference to the Trial Transcripts will be cited at "(Tr.Vol.Page)".

2

Apparently, Rivera had been told that a rival gang member would be looking to exact revenge upon Rivera at the school on that date (Tr.2:72). Rivera proceeded to walk down the street to his home located in the Four Corners area of Dorchester (Tr.2:15). Rivera changed his mind and instead of going home, decided to visit a friend who resided in the Franklin Field area of Dorchester (Tr.2:16). Upon arriving at his friend's house and discovering that his friend was not home, Rivera decided to proceed home (Tr.2:16). While walking on Blue Hill Avenue, Rivera was attempting to hail a cab so that he could go home (Tr.2:16). He then saw another person walking in his direction (Tr.2:16).

As Rivera continued to walk, the two young men looked each other in the eye (Tr.2:18). After the two youths looked at one another, Rivera took a few steps further and continued on trying to fail a cab (Tr.2:16). Suddenly, Rivera heard a loud bang and fell to the ground from a gun shot wound where he subsequently went in and out of consciousness (Tr.2:18).

At that time of this encounter, Rivera was a member of a gang called the Four Corner Pirates and he assocuated the Petitioner with a rival gang called the Buck Shot Crew (Tr.2:16). Petitioner at the time of the shooting, was a student at Madison Park High School and attempted to show at trial, that at the time of the incident, he was at school (Tr.2:20, 122).

At the time of the incident, an elderly man named Herbert Young, Jr., remembered hearing a shot in the direction of

Franklin Field and seeing two people on Blue Hill Avenue (Tr.2:104). According to this witness, the two individuals were approximately five feet apart (Tr.2:105). He was not wearing his glasses at the time but he claimed to see two people, one person was lying on the ground and the other was standing with his arm extended appearing to have been pointing a gun (Tr.2:105).

Two other individuals did not witness the incident but discovered Rivera after he had been shot, Rosa Thimote and Alvin Granger (Tr.3:20). Thimote was driving along when she saw a person lying on the ground on Blue Hill Avenue (Tr.3:17). Suspecting that the young man had suffereed a seizure, she went to take a closer look (Tr.3:18). She stayed with Rivera until the ambulance arrived at the scene (Tr.3:19).

Another motorist, Alvin Granger was heading south on Blue Hill Avenue on the day of the shooting (Tr.3:21). While going through the intersection of Talbot Avenue and Blue Hill Avenue (tr.3:22). Granger did not see the person's face because he was watching for the traffic (Tr.3:23). Granger then noticed another person laying on the ground waving at him (Tr.3:23). Granger approached the individual, saw the injury and asked a passing bus driver to call an ambulance (Tr.3:25). Granger remained on scene until the authorities arrived and recalled that an officer arrived at the scene with a youth in the back of the cruiser (Tr.3:26). The youth was not the Petitioner (Tr.3:26). The officer asked the person on the ground whether

the youth in the cruiser had shot him to which Granger responded that he did not look like the individual he, Granger saw fleeing the scene (Tr.3:26).

Rivera was subsequently taken to the Boston Medical Center where he was treated for his injuries (Tr.2:19). Rivera was then interviewed by Boston Police Officer Richard Caines who had originally had been assigned to the case (Tr.3:40). Officer Caines inquired of Rivera the identity of the shooter to which Rivera continued to respond that he did not know the shooter (Tr.3:42). Police continued to investigate the matter in order to ascertain the identity of the shooter while Rivera continued to slowly recover from his injuries.

Police interviews of Rivera's friend Jose Correia and girlfriend Yanira Ramos revealed conflicting stories as to whether Rivera knew the identity of the shooter. During visits to the Spaulding Rehabilitation Center where Rivera had been tranferred to continue the healing process, Correia remembered talking to Rivera about the shooting while not in the presence of Ramos (Tr.3:46). According to Correia said that Rivera stated that he was not sure of the identity of the shooter (Tr.3:46).

Conversely, Ramos testified that Rivera told Correia that he was shot by the Petitioner in her presence (Tr.3:65). Due to his limited abilities of speech and movement at the

5

time, Rivera indicated the shooter's name by spelling out the letters D A R in the presence of Ramos and Correia, recalled Ramos (Tr.3:66).

Ultimately, Boston Police Officer Windell Josey was assigned to the case (Tr.2:136). Officer Josey obtained the Rivera case through involvement in the investigation of another case involving the assault of one Pedro Rivera (Tr.2:136). Pedro had been assaulted by Sherrod Fernandez, a friend of Petitioner (Tr.2:136). Officer Josey showed two sheets of photographs to Rivera and asked if he recognized anyone in the array (Tr.2:136). Rivera pointed to Petitioner's photograph identifying Petitioner as his assailant on the day of the shooting (Tr.2:142).

There was, however, a discrepancy on how the Petitioner's photograph came to be in the array. At the Dougan hearing, Officer Josey claimed to have received Petitioner's name from a brain storming session that he had in the District Attorney's office with a victim/witness advocate named Mary Kelly. Officer Josey later stated that he had received Petitioner's name from Ramos and therefore obtained Petitioner's photograph to be included in the array shown to Rivera (Tr.2:169). However, Ramos testified that she never gave Petitioner's name to any police officer (Tr.3:70).

After Rivera identified Petitioner as his shooter in February of 1997, Officer Josey obtained an arrest warrant for Petitioner (Tr.2:147). After some difficulty in locating Petitioner, he was eventually arrested in March of 1998 (Tr.2:163).

## ARGUMENTS

I. SENTENCING JUDGE'S LACK OF IMPARTIALITY VIOLATED THE PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW

The Supreme Court held that a sentencing court may not, in determining facts relating to circumstances and details of a crime, draw a adverse inference from a defendant's silence. See Mitchell v. United States, 526 U.S. 314, 327-330 (1999) ( holding also that a guilty plea does not waive the Fifth Amendment privilege against self-incrimination at sentencing ). Cf. U.S. v. Mezas De Jesus, 217 F.3d 638, 644 (9th cir. 2000). See also Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978)( "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort...and ...to penalize a person's reliance on his legal rights is 'patently unconstitutionl.'" )( internal citations omitted ).

In the present case, the sentencing judge's lack of impartiality spilled over onto the record, as illustrated.

> "You know, what he did was reprehensible. I mean--and it's not out of sympathy that I give the sentence I give. It's not in terms of feeling sorry for the victim, although, you know, he's deserving of the sympathy in terms of what his life his life is like not, but the sentence is about his behavoir and what he did that morning on December 13th, 1996. Because, you know, **there's no remorse from this guy, and I don't think he's going to change.**" (Tr.4:8-9)( Emphasis added ).

7

These comments followed the Commonwealth's recommendations of "fifteen-to-twenty years" (Tr.4:5), and after trial counsel pointed out that the Petitioner's "entire record, consists of one conviction for possession of marijuana. That's it." (Tr.4:6-7).

Trial counsel also recommended that based on the lack of criminal record, the sentencing judge should confine the sentence to that as set forth in the sentencing guideline of "five-to-seven-and-a-half" years (Tr.4:7).

Notwithstanding, the Commonwealth's recommendations, and trial counsel plea that the sentence be within the sentencing guidelines, the sentencing judge imposed a sentence of 19 to 20 years. The sentencing judge superseding the Commonwealth's recommendations, in and of itself, calls into question the judge's impartiality. See Commonwealth v. Banker, 21 Mass. App. Ct. 976, 978 (1986)( "In fairness, we think that the sentencing phase of this case must be free of any suggestion of impropriety on the part of the judge." ). Cf. Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980).

A Trial judge may properly "consider indictments or evidence of similar or recurrent criminal conduct if it is relevant in assessing the defendant's character and propensity for rehabilitation." Commonwealth v. Coleman, 390 Mass. 797, 805 (1984).

Hence, for the sentencing judge to have only a marijuana

conviction before it, and suggest that **"there's no remorse from this guy, and I don't think he's going to change"** was improper, and impetus of the sentence imposed. Insofar as, it was marred by the sentencing judge's personal opinion. See Commonwealth v. Lebron, 23 Mass. App. Ct. 970, 972 (1987).

Moreover, the Petitioner made no statements implicit of his guilt or that of having exulted about shooting the victim. Hence, there was no basis or evidence within the record that would justify the sentencing judge to be of the personal opinion that **"there's no remorse from this guy, and I don't think he's going to change"** (Tr.4:9). Compare Commonwealth v. Matthews, 406 Mass. 380, 395-396 (1990). Therein, the defendant told a prosecution witness that he had killed the victim with a baseball bat "[j]ust for the heck of it," and the judge properly considered the defendant's "utter lack of remorse" in declining to adjudicate the defendant as a delinquent. Id.

Unlike, Matthews, the Petitioner's Fifth Amendment right was implicated and "chilled" by the sentencing judge when he stated **"there's no remorse from this guy"** (Tr.4:9). Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973).

Therefore, the appearance of fairness can only be satisfied by vacating the sentences and ordering the Petitioner be resentenced before a different judge. Banker, supra at 978-979.

II.  TRIAL COUNSEL ERRED IN FAILED TO OBJECT TO THE PROSECUTOR'S
     QUESTIONING OF A DEFENSE WITNESS REGARDING A PENDING
     CRIMINAL CAHARGE

In determining if a defendant's counsel has been ineffective, the court applies a two-part test: (1) did counsel's behavior fall measurably below that which might be expected of an ordinarily falliable lawyer and; (2) did counsel's behavior likely deprive the defendant of an otherwise available substantial ground for defense. Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

This standard requires "...a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been a serious incompetency, or inattention of counsel...." Id.

Where tactical or strategic judgments are called into question, defendant must show that his trial attorney's judgment was "manifestly unreasonable." Commonwealth v. Hamm, 19 Mass. App. Ct. 72, 76 (1984).

Lastly, the court must consider whether the prejudice suffered by the defendant resulted from the shortcomings of the trial counsel. Commonwealth v. White, 28 Mass. App. Ct. 417 (1990). These judicial considerations are perculiar to each case and must protect each defendant's Sixth Amendment rights. Commonwealth v. Floretino, 396 Mass. 689 (1986).

Here, the trial counsel was ineffective by failing to object to the prosecutor questioning Correia about his pending manslaughter charge. This impeachment evidence prejudicially injured Correia's credibility in the eyes of the jury and as a direct result, prejudiced the Petitioner's case. See Commonwealth v. Bregoli, 431 Mass. 265, 275 (2000)( "In general, a witness cannot be impeached by use of a specific act of misconduct not resulting in a conviction." ). Cf. Commonwealth v. Podkowka, 445 Mass. 692, 696 (2006). See also Commonwealth v. Atkins, 386 Mass. 593, 600 (1982)( "Evidence of specific acts of misconduct, absent a criminal conviction, is not admissible to impeach a witness." ); Commonwealth v. Bishop, 296 Mass. 459, 460 (1937)( "A conviction must be shown by the record, and cannot be shown by oral evidence." ).

Where Correia's pending manslaughter charge had not yet resulted in a conviction, trial counsel should have objected to the prosecutor impeaching Correia with evidence. See Brodin Handbook of Mass. Evidence, Witnesses, § 6.16.3 (8th ed. 2007)

Moreover, the general rule prohibits impeachment of a witness with questions concerning arrests. See Commonwealth v. Haywood, 377 Mass. 755 (1979). The determination of the relevancy and admissibility of such impeachment testimony lies squarely in the sound discretion of the trial judge. See Commonwealth v. Hamilton, 426 Mass. 67 (1998).

Here, the trial judge was unable to exercise his discretion

on the relevancy of admissibility of the impeachment testimony since trial counsel failed to object to the prosecutor's questioning of defense witness Correia (Tr.3:50). Correia, a friend of Rivera, testified for the defense regarding Rivera's failure to identify the Petitioner prior to viewing him in a police photo array (Tr.3:46). The prosecutor, upon cross-examination of Correia regarding this issue, inquired of Correia information regarding his pending criminal case involving a homicide (Tr.3:50). Defense counsel should have objected in light of Bregoli, supra, and its progeny.

Where there was no evidence produced the Correia's pending charge had resulted in a conviction, the prosecution should not have been allowed to impeach Correia with that information. Bregoli, supra. See Commonwealth v. LaValle, 414 Mass. 146, 151 (1993). Clearly, had defense counsel objected, the court would have had to disallow the questioning.

Instead, the prosecution was allowed to question Correia regarding a **pending** homicide charge (Tr.3:50). This totally irrelevant information was brought to the jury's attention due to trial counsel's ineffectiveness. The injury to Petitioner's case due to counsel's failure to object was enormous when balanced against the fact that Correia was not only a friend of the victim, but also was the only witness to testify that Rivera continued to deny knowing the identity of the shooter from the time of the incident to months later while in rehabilitation (Tr.3:46). Defense counsel could have no possible

12

strategy for not seeking to prevent this damaging information from reaching the jury.

In arguing counsel's failure to prepare and conduct an adequate defense, "defendant can make no headway in absence of a showing that the fault probably resulted in forfeiture of a substantial defense." Saferian, at 98. When tactical or strategic judgments of a lawyer questioned, "we require that such judgments be [shown to be] manifestly unreasonable." Commonwealth v. Rondeau, 378 Mass. 408, 413 (1979), quoting Commonwealth v. Adams, 374 Mass. 722, 728 (1978).

Counsel's failure to object to the prosecution's impeachment of such an important witness infringed upon the Petitioner's rights to effective assaistance of counsel guaranteed by the Constitution of the United States and Massachusetts Declaration of Right and Constitution. See generally, Strickland v. Washington, 466 U.S. 668 (1984).

III. TRIAL COURT COMMITTED REVERSIBLE ERROR BY LIMITING DEFENSE COUNSEL'S CROSS-EXAMINATION OF WITNESSES REGARDING OTHER POSSIBLE SUSPECTS

The trial judge impaired the Petitioner's ability to a fair trial by limiting defense counsel's cross-examination of the victim and other witnesses concerning the possibility of other suspects who may have committed the shooting. See Commonwealth v. Reynolds, 429 Mass. 388 (1999).

It is well settled that a defendant has a right to expose the inadequacies of police investigation. Reynolds, supra at 391, and cases cited. "[A defendant] may argue to the jury that, had the police done certain aspect of their investigation differently, it would have supported his defense." Commonwealth v. Person, 400 Mass. 136, 140 (1987). "The fact that...certain police procedures [were] not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors. The judge should not have removed this evidence from the jury's consideration, and in so doing invade[d] the province of the jury to decide what inferences to draw from certain evidence." Commonwealth v. Bowen, 379 Mass. 472, 486 (1980), citing Commonwealth v. Cote, 5 Mass. App. Ct. 365, 370 (1977).

A defendant must be allowed to introduce evidence to show that another individual may have committed the crime. Commonwealth v. Graziano, 368 Mass. 325 (1975); Commonwealth v. Murphy, 282 Mass. 593, 597 (1933). The defendant should also be allowed to introduce evidence that another person had the motive, intent and opportunity to commit the crime. Murphy, supra. The evidence however, must not be weak or remote. Graziano, supra at 329-330. The evidence "should be closely related to the facts of the case against the defendant." Graziano, supra at 330. A "judge's discretion to exclude such evidence is not absolute and his ruling may be set aside if

14

justice requires a different decision. Graziano, supra, citing Murphy, supra at 598.

Here, the Petitioner's attorney was trying to prove that there were other possible individuals who may have had a motive to shoot Rivera (Tr.2:73, 74). Petitioner's counsel attempted to ask Rivera about the incident involving his friend named Braggs (Tr.2:75). Braggs was shot in front of Rivera's house a few days before Rivera was shot (Tr.2:75). Petitioner's counsel was only allowed to ask Rivera if he knew about the incident but not about the incident itself (Tr.2:75, 76). Defense counsel wanted to see what Rivera knew about the incident because it was gang related (Tr.2:76). Counsel's goal was to prove that there may have been others who possessed a motive to shoot Rivera (Tr.2:73). The court's denial of this inquiry impeded the Petitioner's ability to show that another individual may have committed the crime. Murphy, supra at 597.

Counsel was also denied the opportunity to probe an incident involving Rivera and a Donald Diaz (Tr.2:73). Rivera had an altercation with Diaz at Dorchester High School (Tr.2:73). Defense counsel attempted to connect the Diaz incident and the Braggs shooting (Tr.2:73). The opportunity was denied by the court's prejudicial limitation of defense counsel's questioning of the witness (Tr.2:73). See Commonwealth v. Miles, 420 Mass. 67, 72 (1995).

Additionally, inquiry into why Rivera had not crossed the street when he supposedly saw the Petitioner, recognizing

15

him as a rival gang member and knew that the gang was seeking him, was also disallowed by the court (Tr.2:73). Defense counsel sought to attack the credibility of Rivera testimony that he had an altercation with the Petitioner and his friends (Tr.2:74). Petitioner's attorney wondered why Rivera was not looking over his shoulder in lieu of the fact that his friend, who was shot a few days before (Tr.2:74). This line of questioning was viewed as immaterial to the case and the court sustanied the objections of the prosecution (Tr.2:73). The court committed reversible error in this regard whereby the Petitioner's case was based solely on the identification testimony of Rivera. See Commonwealth v. Vardinski, 438 Mass. 444, 450 (2003)( "Where the issue at a criminal trial is identification, the right to cross-examine must be scrupulously protected." ). Thus, "whenever eyewitness evidence is introduced against an accused," courts "require the utmost protection against mistaken identifications." Commonwealth v. Johnson, 420 Mass. 458, 465 (1995).

    The court's limitation of defense counsel's cross-examination prevented the jury from hearing evidence that another person had motive, opportunity and intent to commit the crime and did so commit the crime. As the evidence suggested included events within days and weeks before the shooting, the evidence was of strong probative value and not remote in time. Graziano, supra at 329-330.

Hence, the court's error denied the Petitioner his rights to present a defense and to cross-examine witnesses pursuant to the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated when the judge refused to allow both a full cross-examination of the prosecution's witnesses and the introduction of exculpatory evidence.

Moreover, the court prejudicially limited the cross-examination of Boston Police Officers Windell Josey and Gregory Brown on material facts in the case, which would have probably created a reasonable doubt in the jurors' minds, that did not otherwise exist.

These points were (1) Whether the Petitioner was listed as a member of the Buck Shot Crew; (2) Whether the Petitioner was associated with a known member of the Buck Shot Crew; and (3) Whether the victim was shot by another person by the name of Hendrick Davis (Tr.2:179, 196-202). The direct testimony of both officers did establish that they had personal knowledge of the Youth Violence Strike Force operation (Tr.2:135, 189), and that Officer Brown was still apart of the Youth Violence Strike Force, knew the Petitioner (Tr.2:192).

However, on cross-examination none of these areas were allowed to be explored by the court. Even moreso, the most crucial point was, some one other than the Petitioner, may have or could have shot the victim (Tr.2:199-201). This amounted to reversible error. Miles, supra at 73 ( violation of right

to cross-examine must be reversed unless harmless beyond reasonable doubt ). And where the Petitioner's constitutional right to cross-examination has been denied, the Commonwealth bears the burden of establishing that the error was harmless. Vardinski, supra. The factors to determine whether the error was harmless is: "The importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corrobating or contradicting the testimony of the witness material points, the extent of cross-examination otherwise permitted, and, of course the overall strength of the prosecutuion's case." Commonwealth v. DiBenedetto, 414 Mass. 37, 40 (1992), quoting Delware v. Van Arsdall, 475 U.S. 673, 684 (1981).

 Here, the importance of the testimony which would not have been cumulative was that the Petitioner was not part of the Buck Shot Crew and that someone other than the Petitioner was accused of shooting the victim, would have raised a reasonable doubt which otherwise did not exist. The presence of evidence corroborating these points can be found therein the record. (Tr.2:178-179, 198-201). In none of these areas were cross-examination permitted, and at best the Commonwealth's case was circumstantial, with the lone exception of the victim's highly questionable identification of the Petitioner.

 Only but for the limitations on the Petitioner's right to effective cross-examination, the trial court committed "constitutional error of the first magnitude" requiring a new trial. Brookhart v. Janis, 384 U.S. 1, 3 (1966).

CONCLUSION

Wherefore, the Petitioner request that his Petition for Writ of Habeas Corpus is ALLOWED.

Respectfully submitted,
By the Petitioner

Darrell Darby, pro se
MCI-Cedar Junction
Post Office Box 100
S. Walpole, MA 02071

Dated: 10-25-07

CERTIFICATE OF SERVICE

I, hereby certify that I have caused the foregoing MEMORANDUM OF LAW to be served upon the Respondent's Counsel, Eva M. Badway, 1 Ashburton Place, Boston, MA 02108, on this 25 day of October, 2007.

Darrell Darby, pro se