# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

**DARRELL DARBY,**        )
      **Petitioner,**        )
               )
**v.**        )        **Civil Action No. 04-11271-NG**
               )
**TIMOTHY HALL,**        )
      **Respondent**        )
_____)

## RESPONDENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE PETITION FOR A WRIT OF HABEAS CORPUS

After a jury trial in Suffolk Superior Court before Massachusetts Superior Court Associate Justice Charles T. Spurlock, the petitioner was convicted of armed assault with intent to murder, assault and battery with a dangerous weapon, possession of a firearm without a license and possession of ammunition without a firearm identification card.  After unsuccessfully pursuing an appeal in the Massachusetts state courts, the petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  By this habeas action, the petitioner contends that his continued incarceration by the respondent[1], the Superintendent of MCI-Cedar Junction, violates federal law.  This memorandum of law is submitted in opposition to the petition for habeas corpus.  The petition must be denied where the petitioner failed to demonstrate that he is entitled to the extraordinary remedy of habeas corpus.

## PRIOR PROCEEDINGS

### A.  State Court Proceedings

On February 27, 1997, a Suffolk County grand jury returned indictments charging the petitioner with armed assault with intent to murder in violation M.G.L. c. 265, § 18, assault and

_____

[1] Peter St. Amand is the current Superintendent of MCI-Cedar Junction.

battery with a dangerous weapon in violation of M.G.L. c, 265, § 15A, possession of a firearm without a license in violation of M.G.L. c. 269, §10(a) and possession of ammunition with a firearm identification card in violation of M.G.L. c. 269, § 10(h). *See* Respondent's Supplemental Answer, [hereinafter cited as "RSA"], Ex. 1. After a jury trial in Suffolk Superior Court in January of 2001, Massachusetts Associate Justice Wendie L. Gershengorn declared a mistrial after the jurors reported a deadlock. *Id.*

The petitioner was retried before Massachusetts Associate Justice Charles T. Spurlock and a jury in February of 2001. *Id.* After a jury convicted the petitioner on all four counts, Judge Spurlock sentenced him to a state prison term of a minimum of nineteen years and a maximum of twenty years on the armed assault with intent to murder conviction, a concurrent nine-to-ten year term for the assault and battery with a dangerous weapon conviction, and a concurrent four-to-five year term for unlawful possession of a firearm. *Id.* After obtaining the petitioner's consent, Judge Spurlock placed the conviction for possession of ammunition without a firearm identification card on file. *Id.*

In his appeal to the Massachusetts Appeals Court, petitioner raised the following claims: (1) trial counsel erred in failing to object to the prosecution's questioning of a defense witness regarding a pending criminal charge; (2) the trial court erred in limiting defense counsel's cross-examination of witnesses regarding other possible perpetrators. *See* RSA, Ex. 3. In his *pro se* brief the petitioner also claimed the following: (a) the sentencing judge lacked impartiality and violated his constitutional right to a fair and impartial trial; (b) trial court's exclusion of evidence that police failed to pursue certain leads was reversible error; and (c) prosecutor's closing argument was likely to amount to a substantial risk of a miscarriage of justice. *See* RSA, Ex. 4.

2

The Massachusetts Appeals Court affirmed the petitioner's convictions.  *See* RSA, Ex. 6,

*Commonwealth v. Darby*, 57 Mass. App. Ct. 1106, 782 N.E. 2d 48 (2003).

The petitioner filed an application for leave to obtain further appellate review in the

Massachusetts Supreme Judicial Court ("SJC") claiming: (1) trial counsel erred in failing to

object to the prosecution's questioning of a defense witness regarding a pending criminal charge;

(2) the trial court erred in limiting defense counsel's cross-examination of witnesses regarding

other possible perpetrators.  *See* RSA, Ex 8.  The SJC denied the petitioner's ALOFAR.  *See*

RSA, Ex. 9.

The petitioner filed a *pro se* ALOFAR in the SJC claiming that the sentencing judge

considered the petitioner's lack of remorse when fashioning the sentence and the Appeals Court

wrongly upheld the lower court's restriction on his cross-examination.  *See* RSA, Ex. 13.

Treating the *pro se* ALOFAR as a motion for reconsideration, the SJC denied it on June 5, 2003.

*See* RSA, Ex. 7.

### B.    Federal Habeas Proceedings

On June 7, 2004, the petitioner filed the instant petition raising the following claims:

(1) the trial judge violated his right to a fair and impartial tribunal by considering his lack of

remorse when determining the sentence; (2) the trial judge improperly restricted cross-

examination of the Commonwealth's witnesses as to whether another rival gang had shot the

victim, whether the petitioner was part of a gang alleged to have shot the victim, and whether the

petitioner was "a known associate of the gang identified as being responsible for shooting the

victim;" (3) ineffective assistance of trial counsel for failing to object to the prosecutions

questioning of a defense witness about pending criminal charges, the trial court's use of his lack

of remorse at sentencing, and not pressing a double jeopardy claim based on retrial after a hung jury; and (4) ineffective assistance of appellate counsel for failing to press a double jeopardy claim based upon retrial after a hung jury. *See* Petition at ¶ 12. On July 12, 2004, the respondent filed a motion to dismiss based upon exhaustion, along with a memorandum of law in support thereof. *See* Docket at 3-4. The petitioner opposed the motion to dismiss and filed a motion to stay. *See* Docket at 5-6. On October 6, 2004, this Court allowed the petitioner's motion to stay the exhausted claims and dismissed the unexhausted claims without prejudice. *See* Docket.

As this court (Dein, U.S.M.J.) explained, due to an administrative oversight, this court did not receive the petitioner's notice that he was pursuing his state court remedies and had filed a motion for a new trial raising double jeopardy issues. *See* September 11, 2007, Report and Recommendation at p. 5, citing SA Ex. 10. Thus, on December 1, 2004, the court lifted the stay on the remaining claims. *Id.* The stay was reinstated on December 9, 2004 upon notice to the court that petitioner was pursuing his state court claims. *Id.* The petitioner also was ordered to report on the status of his state court proceedings by May 10, 2005.

Petitioner filed various status reports from May 11, 2005 through May 16, 2006. *See* September 11, 2007, Report and Recommendation at p. 6. During this period there was no ruling by the state court on his motion for a new trial. *Id.* On December 22, 2005, petitioner filed a motion for leave to file a supplemental motion for new trial in Suffolk Superior Court. *Id.*, citing SA Ex.1 at 12/22/05. In the supplemental motion for new trial, he raised a number of new issues, including ineffective assistance of counsel for failing to object "to the court's terse, one sentence, instruction on honest but mistaken identity." *Id.*, citing SA Ex. 12 at ¶¶ 6,7.

_____On June 16, 2006, petitioner filed in this court a motion for an order directing the state court to rule on his motion for a new trial. *See* Docket at 18. This court (Gertner, U.S.D.J.) denied the motion and ruled that the double jeopardy claims that the petitioner was pursuing were without merit. *See* Docket at 19. Petitioner filed a motion for reconsideration of this order that was denied by this court on July 28, 2006. *See* Docket at 7/28/06.

_____On December 1, 2006, petitioner filed a memorandum of law in support of his petition for a writ of habeas corpus. *See* Docket at 23. Petitioner renumbered his claims and raised additional ones in support of his petition. Specifically, petitioner raised the following claims:

I.    Trial counsel was ineffective by failing to argue the second trial was barred by the principles of double jeopardy, whereby the Commonwealth failed to present sufficient evidence to convict the petitioner at the first trial.

II.   Appellate counsel was ineffective by failing to raise trial counsel's ineffectiveness in a post-conviction motion for a new trial.

III.  The state court violated the petitioner's right to a fair and impartial tribunal during the sentencing phase.

IV.   The state court violated petitioner's right to effective cross-examination of Commonwealth's witness.

V.    Trial counsel was ineffective by failing to object to the Commonwealth's questioning of petitioner's witness of pending charges.

VI.   Trial counsel's failure to object to the lack of a thorough instruction on honest but mistaken identification amounted to ineffective assistance of counsel.

VII.  Federal court's removal of stay notwithstanding exhaustion was in progress in state court, constitutes cause allowing petitioner to have his claims to be considered directly by this Court.

*See* September 11, 2007, Report and Recommendation at p. 7-8, citing Docket No. 23. As this

court explained, grounds one and two raise the double jeopardy claims which are the basis for petitioner's motion for a new trial in state court, and this court's order of October 6, 2004. Ground six is the claim included in petitioner's motion for a new trial, which has not yet been acted upon by the state court. Ground seven is a new count that was not presented to the state courts. *See* September 11, 2007, Report and Recommendation at p. 8. The respondent filed a second motion to dismiss based upon petitioner's failure to exhaust. *See* Docket at 25. The petitioner filed an opposition to the motion to dismiss and a motion to stay. *See* Docket at 29, 30, and 32. On September 11, 2007, this court (Dein, U.S.M.J.) issued a report and recommendation recommending that the respondent's second motion to dismiss be denied without prejudice and petitioner's motion to stay be denied as well. *See* Docket at 34. Petitioner moved to voluntarily dismiss his unexhausted claims. On September 25, 2007, this Court (Gertner, U.S.D.J.) entered an order adopting the report and recommendation, denying the petitioner's motion for a stay and the respondent's second motion to dismiss. *See* Docket at 9/25/07. The petitioner filed another memorandum of law in support of his exhausted claims. The respondent now files this memorandum of law in opposition to the petition for habeas corpus.

### <u>STATEMENT OF THE FACTS</u>

**A.    The Commonwealth's Case**

The victim, a fifteen-year-old freshman at Dorchester High School, belonged to a gang called Four Corners Pirates, which was engaged in an ongoing dispute with a rival gang, the Buck Shot Crew. Tr. /43.[2] The petitioner was a member of the Buck Shot Crew. Tr. 2/42, 98.

---

[2] References to the trial transcript are cited as Tr.(Volume)/(Pages).

The petitioner and the victim were involved in a street fight between their gangs.  Tr. 2/45, 77, 81-84, 99.  Additionally, the victim had seen the petitioner at least five to eight times.  Tr. 2/43, 99.  On December 13, 1996, the victim arrived at school around 7:00 a.m.. Tr. 2/35-36. Classmates told him that a "a group of kids" was looking for him.  Tr. 2/36, 72, 85.  The victim left school later that morning in order to avoid the kids who were looking for him.  Tr.2/36, 38, 85.  He went to visit his friend Tony, who lived near Franklin Field.  Tr.2/36.  Because Tony was not home, the victim walked to Blue Hill Avenue and tried to hail a taxi to get home.  Tr. 2/37. While walking along Blue Hill Avenue, the victim noticed someone wearing a hood covering half of his head walking toward him from fifteen to twenty feet away.  Tr. 2/39, 40-43, 58.  When the victim came within one and one-half  feet of the person he recognized him as the petitioner Darrell, from the Buck Shot Crew.  Tr.2/20-43, 58, 88-89.  The victim made eye contact with the petitioner and saw his entire face.  Tr.2/40.  The victim kept walking and called out for a cab, he then heard a loud gunshot, felt his body go numb, and lost consciousness. Tr.2/40, 46, 58.  He had been shot in the neck, and the bullet struck his spine.  Tr.2/38.[3]   The shooting occurred between 8:45 and 8:50 in the morning.  Tr.2/167.

Some motorists on Blue Hill Avenue helped the victim, while the police and paramedics were called.  Tr.3/18, 24-25, 30.  As a result of his injury the victim remained in the Boston Medical Center for one month, after which he was transferred to Spaulding Rehabilitation Center, where he spent fourteen months in recovery.  Tr. 2/49.  The victim could not speak for about one year because he needed a tracheotomy and was on a ventilator.  Tr.2/50. Consequently,

---

[3] The victim, who has been paralyzed since the day of the shooting, is a quadriplegic. M.H.6, Tr. 2/19, 69,

he used an alphabet chart to spell out words that he wished to communicate.  Tr.2/50.

Sometime during the first couple of weeks during the victim's stay at Boston Medical Center, his girlfriend Yanira Ramos, along with Jose Correia, a fellow member of the Four Corners Pirates, visited the victim.  Tr.3/47, 64, 69.  During this visit, the victim identified the petitioner as the shooter by spelling out the petitioner's first name on the alphabet chart.  Tr.2/52, 94, 96.  During the trial Ramos testified that Correia asked the victim who shot him, and the victim used his alphabet chart to spell out something that only Correia could see.  Tr.3/65-66. Correia, looking at what the victim spelled out, said that someone from "BSC" was the shooter. Tr.3/66.  The victim then spelled out something else.  Tr. 3/66.  When Correia, seeing what the victim was spelling, said that Darrell did it, the victim nodded his head "yes" and began to cry. Tr. 3/66.

Shortly after that hospital visit, Detective Windell Josey interviewed Ramos and learned about the victim's identification of Darrell as the shooter.  Tr.2/137-139.  As a result, Detective Josey compiled two photographic array of nine to twelve images each, one of which contained the petitioner's picture.  Tr.2/139-140, 144.  On February 9, 1997, Detectives Josey and Richard Caines showed the victim these two arrays at Spaulding Rehabilitation Center.  Tr.2/140-141. The victim identified the petitioner as the person who shot him.  Tr.2/144.  At trial, the victim repeatedly testified that he was "100% sure" that the petitioner was the assailant.  Tr.2/62, 102.

Detective Josey immediately obtained a warrant for the petitioner's arrest and tried to serve it at his residence.  Tr.2/147-148.  The petitioner was not there.  Over the following several weeks, the authorities made repeated unsuccessful attempts to find the petitioner at home, in his neighborhood, and at school.  Tr.2/203; 3/14-15.  On March 20, 1997, the petitioner was

8

permanently expelled from school for non-attendance.  Tr. 2/118, 123, 128, 133.  After a major

effort to locate the petitioner, using wanted posters throughout Boston and several articles in

major news media, officers arrested the petitioner in January 20, 1998, in Roxbury.  Tr.2/163,

204; 3/149-153.

**B.    The Petitioner's Case**

The petitioner tried to present an alibi defense by suggesting through cross-examination

of the petitioner's school registrar that he had been at school when the shooting occurred.

Tr.2/123.[4]  During the cross examination of the victim, petitioner suggested that the victim had

purposely misidentified him in order to retaliate against him and the Buck Shot Crew for long

standing gang animosity.  Tr.2/90-92.  In connection with the petitioner's misidentification

theory, Detective Caines testified that, immediately after the shooting, the victim had stated that

he had not recognized his assailant.  Tr.3/42.[5]  Furthermore, Correia claimed that when he visited

the victim at the Boston Medical Center, the victim never named petitioner as the shooter.

Tr.3/46-47.

**C.    The Trial**

**1.    The Petitioner's Cross Examination of the Victim**

Through the cross-examination of the victim, the petitioner suggested that someone other

than the petitioner had a motive to commit the crime.  Tr.2/72-77.   First, defense counsel elicited

---

[4] School records reflected that on the morning in question, the petitioner did not attend
class after homeroom, which ended at 7:55 a.m. Tr.2/111, 125-126, 128, 132-33.

[5]During the trial the victim explained that he did not immediately disclose the identity of
his attacker because he hated the police, he feared for his family's well-being, and he wanted to
personally retaliate against his assailant.  Tr.2/65-66, 89-90, 98.

that the victim's gang had "trouble" with groups other than the Buck Shot Crew. Tr.2/72. The victim also acknowledged that he had a fight at school with Rinaldo Diaz, sometime before the shooting. Tr.2/73. Counsel continued cross-examination by asking whether the victim knew about someone named Steven Braggs having been shot in front of the victim's home a few days before the victim was shot. Tr.2/73. The prosecutor objected. Tr.2/73-74. At sidebar, defense counsel sought permission to explore evidence of certain violent incidents, such as the Braggs incident, involving individuals other than the victim and the petitioner. Tr.2/73-76. Defense counsel explained that he wanted to suggest that there were other possible perpetrators. Tr.2/73. Counsel also wanted to suggest that, if the petitioner had truly been the person whom the victim encountered on Blue Hill Avenue, the victim, upon recognizing the petitioner as a member of a rival gang, would have fled as soon as he saw him. Tr.2/73-74. The trial judge gave the defense counsel latitude to probe the fact that certain other incidents had occurred but barred counsel from delving into irrelevant details about those incidents. Tr.2/76.

Defense counsel continued cross-examination by asking the victim again whether he knew about the shooting of Braggs. Tr.2/76. The victim responded affirmatively. *Id.* Defense counsel brought forth information about a "beef" the victim had with a group called the Stonehurst Kids, and that Derrick Smith was stabbed in front of the victim's house several months before the victim was shot. *Id.* Finally, the victim recognized that a few days before the shooting, a person named Sherrod Fernandez made a threatening hand gesture that caused the victim to run away. Tr.2/77.

10

### 2.    The Commonwealth's Cross-Examination of Correia

During cross-examination, the prosecutor asked Correia whether members of Four

Corners Pirates as a general practice reported incidents of gang violence to the police. Tr.3/48-

49. Correia set forth that gang members handled such matters on their own and never reported

them to the police, because that would be "snitching." Tr.3/49-50. Correia explained that Four

Corners Pirates took care of gang violence "on the street" and did not involve the legal system in

those disputes. *Id*. When asked whether he was awaiting trial on a homicide charge, Correia

responded affirmatively. Tr. 3/50. Defense counsel did not object. *Id.*

**I.    This Habeas Petition Should Be Denied Where the Trial Judge Properly Considered
The Petitioner's Lack of Remorse for Rendering the Victim A Quadriplegic When
Imposing the Sentence for Petitioner's Convictions.**

### A.    The Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") imposes a requirement

of deference to state court decisions. *See Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001).

However, if a habeas petition presents a federal claim that was raised before the state court but

left unresolved, this court reviews the claim *de novo*. *Horton v. Allen*, 370 F.3d 75,80 (1st Cir.

2004). *De novo* review applies to the petitioner's Fifth Amendment claim.

### B.    Habeas Relief Should Be Denied Because The Trial Judge Properly
Considered the Petitioner's Lack of Remorse When Sentencing the Petitioner

The petitioner asserts that the trial judge's lack of impartiality violated his constitutional

right to a fair trial and due process. *See* Petitioner's Memorandum at p. 7.[6]  In support of his

---

[6] This claim was presented in the Massachusetts Appeals Court, who rejected the claim
for the reasons stated in the Commonwealth's response to the petitioner's *pro se* brief at pages
two through twenty-one. *See* RSA, Ex. 6, *Commonwealth v. Darby*, 57 Mass. App. Ct. 1106,
782 N.E. 2d 48 (2003). In footnote five, the Commonwealth noted that there is nothing in the

petition, the petitioner refers to the following trial judge's statement:

> You know, what he did was reprehensible. I mean -- and it's not out of
> sympathy that I give the sentence that I give. It's not in terms of feeling
> sorry for the victim, although, you know he's deserving of the sympathy
> in terms of what his life is like now, but the sentence is about [the petitioner's]
> behavior and what he did on that morning on December 13, 1996.....Because,
> you know, there's no remorse from this guy, and I don't think he's going to change.

Tr.4/8-9. As set forth above, the trial judge sentenced petitioner to a state prison term of a

minimum of nineteen years and a maximum of twenty years on the armed assault with intent to

murder conviction, a committed, concurrent nine-to-ten year term for the assault and battery with

a dangerous weapon conviction, and a committed, concurrent four-to-five year term for unlawful

possession of a firearm. *See* RSA, Ex. 1.

The petitioner relies upon *Mitchell v. United States*, 526 U.S.314 (1999) to support his

claim that there is no basis in the record to justify the trial judge's opinion that "there's no

remorse from this guy, and I don't think he is going to change." *See* Petitioner's Memorandum at

p. 9. The Fifth Amendment protections against self-incrimination do apply at sentencing

proceedings. *See Mitchell v. United States*, 526 U.S. at 326-27. In *Mitchell v. United States*, the

Supreme Court held that "in *determining facts* about the crime which bear upon the severity of

the sentence, a trial court may [not] draw an adverse inference from a defendant's silence."

*Mitchell v. United States*, 526 U.S. at 316-17.(emphasis added). Mitchell involved a federal

drug conviction, subject to the then-mandatory United States Sentencing Guidelines. In order to

calculate Mitchell's guideline range, the district court held an evidentiary hearing to determine

the quantity of drugs attributable to Mitchell. *Id.* Some of Mitchell's co-defendants testified at

---

record to indicate that the petitioner objected to the sentence or that he filed a motion to revise
and revoke the sentence imposed. *See* RSA, Ex. 8.

the hearing. *Id*. The district court credited their testimony, and remarked that "[o]ne of the things persuading the court to rely on the testimony of the co-defendants was [Mitchell's] not testifying to the contrary. *Id.* at 319. (quotation marks omitted). The Supreme Court held that the Fifth Amendment prohibited the district court from taking an adverse inference from Mitchell's silence in determining the disputed fact, specifically, the drug quantity. *Id.* at 327-80.

It is worth noting that the Supreme Court limited its prohibition against adverse inferences to factual determinations:

> Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Guidelines (1998), is a separate question. It is not before us, and we express no view on it.

*Id.* at 330. Thus, as the Tenth Circuit held in rejecting a habeas claim like the petitioner's, "it remains unanswered by the Supreme Court whether a sentencing court in a non-capital case may, for the purposes other than determining the facts of the offense of conviction, draw an adverse inference from a criminal defendant's refusal to testify or cooperate." *Lee v. Crouse*, 451 F.3d 598, 605 (10th Cir. 2006)(holding that "there was no 'clearly established' law prohibiting what the trial court did in [that] case, specifically, drawing an adverse inference from [his] refusal to submit to a psychological evaluation for purposes of determining whether [he] represented a continuing danger to society and/or whether he was amenable to rehabilitation").

Furthermore, the petitioner fails to demonstrate how the challenged statement of the trial judge conveys that the trial judge increased his sentence because of the petitioner's silence. The trial judge can make conclusions and inferences based upon the record before him. In fact, a trial judge may consider the absence of remorse in determining the severity of a sentence. *See*

*United States v. Schniederhan*, 404 F.3d 73 (1st Cir. 2005)(First Circuit affirmed the district court decision where the district court justified the severity of the sentence based on the "severity of the crime and...lack of remorse."); *Correia v. Hall*, 364 F.3d 385 (1st Cir. 2004)(Habeas relief denied state court sentence was harsher than discussed during pre-trial because of sentencing judge's finding of "recklessness...and...apparent lack of remorse."). Here, the trial judge sentenced the petitioner on the circumstances of the crime for which he was convicted. Thus, although the Fifth Amendment protections against self-incrimination do apply at sentencing proceedings, *see Mitchell v. United States*, 526 U.S.at 326-327, no violations of these protections occurred.

**II.     This Habeas Petition Should Be Denied Where the Petitioner's Claims Relative to Ineffective Assistance of Counsel and Limitations on Cross-Examination Were Properly Adjudicated by the Massachusetts Appeals Court Which Did Not Render A Decision That Was Contrary To, Or An Unreasonable Application of, Clearly Established Federal Law.**

   **A.     The Standard of Review.**

"Under AEDPA, Congress prohibited federal courts from granting habeas relief unless a state court's adjudication of a claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939-40, 2007WL 1387923*5 (2007), *quoting* § 2254(d)(1). A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams*

*v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient – the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002) (*citing Taylor*, 529 U.S. at 411); *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) ("'some increment of incorrectness beyond error is required'. . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court," *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Where, for instance, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37 (*citing O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).

In some habeas cases, resolution of petitioner's claims will turn entirely on the state court's determination of the underlying factual issues. *DiBenedetto v. Hall*, 272 F.3d 1, 7 n.1 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002). This is because, under the AEDPA, state court factual determinations are "presumed to be correct," unless the petitioner rebuts this "presumption of correctness" by coming forward with "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). The presumption of correctness applies to all "basic, primary, or historical facts" underlying the state court's conclusion, *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *see also Thompson v.*

*Keohane*, 516 U.S. 99, 111-13 (1995) (for purpose of *Miranda*, scene-setting factual findings

involving the trial court's assessment of credibility, are presumed to be correct), and extends to

factual determinations made by both state trial and appellate courts.  *Rashad v. Walsh*, 300 F.3d

27, 34 (1st Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003).

  **B.      The Petitioner Received Effective Assistance of Counsel.**

    In *Williams v. Taylor*, 529 U.S. at 390-391, the Supreme Court held that *Strickland v.*

*Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled claims

related to ineffective assistance of counsel.  Thus, a petitioner alleging ineffective assistance of

counsel must establish two elements in state court in order to prevail:

> First, the [petitioner] must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the [petitioner] by the Sixth Amendment.  Second, the
> [petitioner] must show that the deficient performance prejudiced
> the defense.

*Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002), *citing Strickland*, 466 U.S. at 687.

     In state court, the petitioner bore the heavy burden of proving ineffective assistance,

*Scarpa v. DuBois*, 38 F.3d 1, 8-9 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Lema v.*

*United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required the two-part analysis articulated

above.  First, "'judicial scrutiny of counsel's performance must be highly deferential.'" *Ouber v.*

*Guarino*, 293 F.3d at 25, *citing Strickland*, 466 U.S. at 689.  Furthermore, the reviewing court

must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis

of what he knew, or should have known, at the time his tactical choices were made and

implemented.  *Id., citing Bell v. Cone*, 535 U.S. 685, 696 (2002); *United States v. Natanel*, 938

F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992).  Only if, "in light of all the circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance," can a finding of deficient performance ensue.  *Ouber  v. Guarino*, 293 F.3d at 25, *quoting Strickland*, 466 U.S. at 690.  In fact, "'the proper measure of attorney performance remains simply reasonableness under prevailing  professional norms.'" *Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006), quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(quoting *Strickland*, 466 U.S. at 688)(internal quotation marks omitted).

Secondly, even if a lawyer's performance is constitutionally unacceptable, relief will be withheld unless the petitioner demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ouber v. Guarino*, 293 F.3d at 26,  *quoting Strickland*, 466 U.S. at 694.  While this level of prejudice may be presumed in a few settings, that is the exception, not the rule.  *Id*. (citing *Strickland*, 466 U.S. at 694).  Indeed, the petitioner must demonstrate that he was prejudiced, *i.e.*, that his attorney's parlous conduct may have altered the outcome of the case.  *Id.* (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)).  Although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent.  *Id.*(citing *Strickland*, 466 U.S. at 693 (explaining that "a [petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case")).

The petitioner asserts that he was denied the effective assistance of counsel because his trial counsel failed to object to the prosecutor's questioning a defense witness about a pending homicide charge.  *See* Petitioner's Memorandum at p. 10.   In its review of the record, the Appeals Court reasonably rejected the petitioner's ineffective assistance of counsel claim,

explaining:

> The [petitioner] also claims that his trial attorney was ineffective for failing to object to the prosecutor's questioning of a defense witness regarding a homicide charge pending against the witness, a friend of the victim. The witness testified that the victim did not identify the person who shot him in his presence. On cross-examination, the prosecutor impeached the witness's credibility by having him acknowledge that he and his friends did not involve police in their violent disputes with other gangs (Tr. 3:49-50), eliciting inconsistencies between his testimony and his description of events on prior occasions (Tr. 3:53-55), and his extensive history of criminal convictions (Tr. 3:48, 52, 55-57). The prosecutor also inquired whether he currently was awaiting trial for a homicide; the witness acknowledged that he was. (Tr. 3:50) Although disallowing the testimony on the homicide charge would have been within the judge's discretion, no objection was made to the testimony. The [petitioner]'s ineffectiveness claim fails, however, as he cannot show that he was prejudiced by the testimony when his witness's credibility, without considering the testimony on the pending homicide charge, had already been severely compromised by the prosecutor on other bases. *Commonwealth v. Saferian*, 366 Mass. 89, 98, 315 N.E.2d 878 (1974). *Commonwealth v. Scott*, 428 Mass. 362, 369, 701 N.E.2d 629 (1998) (no showing that counsel's performance "created an error or errors which were likely to have influenced the jury's conclusions" [internal quotation marks, citation omitted] ).

*See* RSA, Ex. 6, *Commonwealth v. Darby*, 57 Mass. App. Ct. 1106, 782 N.E. 2d 48. In its

decision, the Appeals Court applied the performance/prejudice framework analysis mandated by

*Strickland*. It is of no consequence that the Appeals Court did not explicitly mention *Strickland*

where it applied Massachusetts' enunciation of the ineffective standard derived from

*Commonwealth v. Saferian*, 366 Mass. 89, 315 N.E. 878 (1974). As the First Circuit has

affirmed, *Saferian* is the functional equivalent of *Strickland*. *See Ouber v. Guarino*, 293 F.3d at

44, *citing Scarpa*, 38 F. 3d at 7-8. In fact, the petitioner does not cite *Strickland*, or any federal

law in support of his petition. *See* Petitioner's Memorandum at pp.10-13. Because the Appeals

Court identified and articulated the substance of the *Strickland* standard, and was not presented

facts that were materially indistinguishable from those at issue in *Strickland*, the "contrary to"

portion of the AEDPA analysis drops from the equation. *See Williams v. Taylor*, 529 U.S. at 406

("a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of the prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to' clause"). In other words, *Strickland* and its progeny do not require an outcome "contrary to" that reached by the Appeals Court.

Further, a review of the record demonstrates that the Appeals Court's decision applying *Strickland* was not objectively unreasonable. In the instant case, the prosecutor impeached the witness with evidence independent from his pending homicide charge. As explained above, Correia testified that he and his fellow gang members handled violence on the street themselves, rather than reporting it to the police. *See* Tr. 3/49-50. Correia set forth that involving the police would be "snitching." *Id*. Additionally, Correia acknowledged that his criminal record included convictions for the crimes of breaking and entering with intent to commit a felony, receipt of stolen property, unlawful possession of ammunition and unlawful possession of a firearm. *See* Tr. 3/55-57. For these reasons the Appeals Court correctly concluded that the petitioner's ineffective assistance claim fails because he cannot show that he was prejudiced by the testimony when his witness's credibility, without considering the testimony on the pending homicide charge, had already been compromised by the prosecutor on other grounds. *See* R.A., Ex. 6, *Commonwealth v. Darby*, 57 Mass. App. Ct. 1106, 782 NE 2d 48, citing *Commonwealth v. Sapphirine*, 366 Mass. 89, 98, 315 N.E.2d 878 (1974). *Commonwealth v. Scott*, 428 Mass. 362, 369, 701 N.E.2d 629 (1998) (no showing that counsel's performance "created an error or errors which were likely to have influenced the jury's conclusions"). Accordingly, the petitioner cannot demonstrate that the Appeals Court unreasonably applied *Strickland*.

**C.    The Appeals Court's Decision Relative to the Limitation on Cross-Examination of Witnesses was Neither Contrary to, nor an Unreasonable Application of Supreme Court Precedent.**

Petitioner claims that the trial judge denied him a fair trial by limiting defense counsel's cross-examination of the victim and other witnesses concerning the possibility of other suspects who may have committed the shooting.  *See* Petitioner's Memorandum at p. 13.

The  AEDPA analysis of this claim can be guided  by *Bui v. DiPaolo*, 170 F.3d 233, 242 (1st Cir. 1999), *cert. denied*, 529 U.S. 1086 (2000) and *DiBenedetto v. Hall*, 272 Cir. 1, which authoritatively foreclose the possibility of habeas relief for this petitioner.  In *DiBenedetto*, the First Circuit explained that

> [*Delaware v.*] *VanArsdall*,[ 475 U.S. 673, 679 (1986)] sets forth the test for determining whether a limitation on cross-examination violates the Confrontation Clause. The first question to be asked under the *Van Arsdall* test is whether the limitation prejudiced the examination of that particular witness. In other words, absent the limitation, would the jury have received a "significantly different impression" of the witness's credibility? *Id.* at 679-80, 106 S.Ct. 1431; *see also United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.1986) (limitation on questions regarding witness's commission of two murders, giving him motive to cooperate with government, not prejudicial because cross-examination had established that he received a favorable sentencing recommendation in exchange for testimony). The second element of the *Van Arsdall* test is whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted. *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. 1431.

*DiBenedetto v. Hall*, 272 F.3d at 10.  Additionally, in *Bui*, the First Circuit remarked that "the jurisprudence of the Confrontation Clause rarely lends itself to Procrustean application."  *Bui v. DiPaolo*, 170 F.3d at 241, citing *O'Brien v. DuBois*, 145 F.3d at 26.  Indeed, in *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), the Court explicitly recognized that a trial judge possesses broad discretion to limit cross-examination on the issue of bias.  *Bui v. DiPaolo*, 170 F.3d at 242.

 As already explained in *Bui*, "to the extent that the petitioner is suggesting that a criminal

defendant has license to cross-examine a prosecution witness concerning every conceivable

theory of bias, regardless of the prevailing circumstances, he is plainly wrong." *Id.*    The

petitioner has offered no Supreme Court authority (and there is none) to which the Appeals

Court's decision is contrary.  Since the Appeals Court identified and articulated the substance of

the *Van Arsdall* standard, the contrary to portion of the analysis drops from the equation.  *See*

*Williams v. Taylor*, 529 U.S. at 406 ("a run-of-the-mill state-court decision applying the correct

legal rule from our cases to the facts of the prisoner's case would not fit comfortably within

§2254(d)(1)'s 'contrary to' clause").  In other words, *Van Arsdall* does not require an outcome

"contrary to" that reached by the Appeals Court.

       Given the required balancing which is undertaken to review a confrontation claim,

"rather than applying a strict one dimensional legal rule," this Court must review the Appeals

Court's decision to determine whether it was reasonable.  *Bui v. DiPaolo*, 170 F.3d at 242;

*O'Brien v. DuBois*, 145 F.3d at 26.  *See Holman v. Gilmore*, 126 F.3d 876, 881-882 (7th Cir.

1997) ("when the constitutional question is a matter of degree, rather than of concrete

entitlements, a 'reasonable' decision by the state court must be honored"), *cert. denied*, 522 U.S.

1150 (1998).  As the Appeals Court recognized in this case, defense counsel was permitted to

question witnesses about other individuals with motives to injure the victim.  *See* RSA, Ex. 6,

*Commonwealth v. Darby*, 57 Mass. App. Ct. 1106, 782 N.E. 2d 48.   Thus, the Appeals Court

reasonably concluded that limiting further testimony, particularly in regards to details, was well

within the judge's discretion, as the testimony was highly speculative.  *Id.*, citing *Commonwealth*

*v. Lawrence*, 404 Mass. 378, 387, 536 N.E.2d 571 (1989); *Commonwealth v. DiBenedetto*, 427

Mass. 414, 420-21, 693 N.E.2d 1007(1998); *Commonwealth v. Gittens*, 55 Mass. App.Ct. 148,

156, 769 N.E.2d 777(2002)("Other than defendant's own speculation, there was no support for

the inquiry").   Accordingly, the petitioner cannot demonstrate that the Appeals Court

unreasonably applied *Van Arsdall*.  Habeas relief should be denied.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus should be denied.

Respectfully submitted,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Eva M. Badway
Eva M. Badway
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2824
Dated: November 7, 2007            BBO # 635431

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 7, 2007.

/s/ Eva M. Badway
Eva M. Badway

22